THE CORTLAND MANUFACTURING COMPANY (LIMITED) v. GEORGE W. PLATT ET AL.

| 83 | 419 |
|----|-----|
| 122 | 114 |

*Fraudulent purchase—Right of rescission—Commercial agencies—Evidence—Use of memoranda.*

1. A defrauded vendor does not lose his right to rescind by making an effort to compromise or obtain payment for the property, unless he does some act which evinces a clear intention to waive such right.

2. Where a witness makes use of *memoranda* in testifying, and swears that he could not testify to the exact figures without its aid, and to that end had used it throughout his direct examination, the attorneys for the opposing party are entitled to an inspection of the paper to enable them to cross-examine the witness; citing *Duncan v. Seeley*, 34 Mich. 369; *People v. Lyons*, 49 Id. 78.

3. This Court has not gone so far in any case as to hold that traders must report to the commercial agencies every variation in their circumstances.

4. It is only when traders are in an insolvent condition, and are or should be aware that they will be obliged to suspend or fail in their business, that they owe it as a duty to creditors, or

those they solicit to deal with them upon credit, to inform them of their situation, or to notify the commercial agencies of their changed situation, and purchases not made in good faith, while in such straits, may well be regarded as fraudulent.

5. Fraud cannot be predicated upon the fact that a merchant or trader makes a truthful representation of his standing to a commercial agency, and thereby obtains credit. If a considerable time elapses, and no new representations are made, it cannot be said that, if his condition has changed, he is guilty of actual fraud, unless he knows, or the circumstances are such that he should know, that the credit is extended upon the strength of the original rating of the agency.

6. Fraud is a question of fact to be deduced from all of the circumstances, and a vendor cannot shut his eyes to subsequent reports of the commercial agencies tending to cast doubt and suspicion upon the financial ability and credit of a merchant or trader, and rely upon a year-old statement made by such person.

7. In this case the jury found specially that the defendant was worth $5,000, or more, over and above all liabilities, when he purchased the goods of the plaintiff which are sought to be reclaimed, and that at that time he intended to pay for them, which finding is held to be inconsistent with any verdict except in favor of the defendants.

Error to Berrien. (O'Hara, J.) Argued October 29, 1890. Decided December 5, 1890.

Replevin. Defendants bring error. Reversed, and case remanded, with instructions to trial judge to vacate judgment for plaintiff, and to render one in favor of defendants, to the end that such further proceedings may be had as are allowed by statute. The facts are stated in the opinion.

*Spafford Tryon* and *G. M. Valentine,* for appellants.

*George S. Clapp, A. Plummer, N. A. Hamilton,* and *Lawrence C. Fyfe,* for plaintiff.

CHAMPLIN, C. J. Plaintiff brought replevin for certain wagons, poles, and seats.

The defendant George W. Platt had, prior to February 3, 1889, been engaged in the mercantile business at Benton Harbor, the principal line of his business being hardware. He was also interested in the milling business at that place. He was assisted in his store by his son, Frank H. Platt, who, during his father's absence or inability to attend to business on account of sickness, exercised full control over the business. In 1887, George W. Platt drew money out of his hardware business to invest in the milling business; and, to meet a bank-note and bills maturing, on August 7, 1887, he borrowed $3,000 of the Bank of Benton Harbor, and gave security by way of a chattel mortgage upon his stock of hardware. This mortgage was, by mutual consent, not placed upon file, and in December, 1887, this debt had all been paid except $900, for which the bank took three notes, of $300, $100, and $500, respectively. On January 27, 1888, there was due on this mortgage the principal sum of $600, and on that day, unknown to Platt, the mortgage was placed on file. On February 2, 1888, the mortgage was paid in full and discharged. The filing of the mortgage caused inquiries to be made by the creditors of Platt, who was then sick; and his son, Frank H., without the knowledge of his father, prepared, and on February 10, 1888, gave to the collecting agency of R. G. Dun & Co., a statement of the financial standing of George W. Platt on January 1, 1888, as follows:

STATEMENT.

| | |
|---|---:|
| Benton Harbor Milling Co. | $4,000 00 |
| 41½ acres in city limits, Niles, Mich. | 5,000 00 |
| House and lot, St. Jo., Mich. | 2,000 00 |
| One-seventh interest in estate, Niles, Mich. | 1,000 00 |
| One-half interest in store, lot, and building, Bangor, Mich. | 500 00 |
| | $12,500 00 |
| Incumbrance on above | 5,000 00 |
| | $7,500 00 |

| | | |
|---|---:|---:|
| Invoice merchandise | $14,031 27 | |
| Tinners' tools and store fixtures | 836 00 | |
| Notes | 2,165 56 | |
| Accounts receivable | 5,353 05 | |
| Freight, boxing, and carting on merchandise, 3 per cent | 419 73 | |
| | $22,805 61 | |
| Liabilities, sundry accounts | 7,615 49 | 15,190 12 |
| Total assets in excess of liabilities | | $22,690 12 |

A schedule of liabilities upon merchandise accounts was attached. The correctness of the statement was sworn to by Frank H. Platt. On May 12, 1888, Dun's agency attached to such statement of Platt "an opinion of statement" of their own, as follows:

### "OPINION OF STATEMENT.

"May 12, '88. Should suppose that the only question here would be as to the value of real estate, etc. Writer has seen his ledger, which shows, as he recollects it, something of this sort: 'Estimated Niles property at $5,000.' Understand that it is worth about $4,000."

Again, on June 5, Dun's agency made another report, as follows:

"June 5, 1888.

"In writer's opinion, following is a more correct statement:

| | | |
|---|---:|---:|
| Invoice of merchandise | $8,000 00 | |
| Tinners' tools, etc. | 500 00 | |
| Farmers' notes | 2,165 56 | |
| Accounts receivable | 5,353 05 | |
| Three per cent. for freight, etc. | 419 73 | |
| "Have very good reasons for placing the invoice at | $8,000 00 | |
| The tinners' tools are old, and more or less out of date, and hardly worth $500 | 500 00 | |
| The farmers' notes may foot up the figures given, but for some reason were not discountable at the time of the chattel mortgage difficulty, Feb. 2, 1888 | 2,165 56 | |
| Accounts receivable are not worth over 50 cents on the dollar | 3,211 83 | |

| | | |
|---|---:|---:|
| Three per cent., boxes, carting, etc. | $240 | 00 |
| Total | $14,117 | 39 |
| Total indebtedness on stock | 7,615 | 49 |
| Balance | $6,501 | 90 |
| 160 shares in milling company, at $25 | 4,000 | 00 |
| 41 acres, Niles city limits | 5,000 | 00 |
| St. Joseph house and lot | 2,000 | 00 |
| One-seventh interest in house of Platt estate | 1,000 | 00 |
| One-half interest in Bangor house and lot | 500 | 00 |
| Total | $19,001 | 90 |
| Mortgage incumbrances | 5,000 | 00 |
| | $14,001 | 90 |

"As to 160 shares, he first bought 80 shares at
$25, making $2,000; subsequently subscribed for
80 more, and hypothecated the first 80 to
secure the payment of the second 80, leaving
only, say $2,000. The 41 acres are not worth
$5,000. They are not worth more than $2,500.
An outside figure is $3,000. The St. Joseph
house and lot he recently sold for $1,500. One-
seventh interest in the Geo. Platt family resi-
dence at Niles, Mich., is good, but not avail-
able. One-half interest in Bangor house and
lot is not worth more than the other half,
which recently sold for $350.

#### "Recapitulation.

| | | | |
|---|---:|---:|---:|
| Assets, stock | | $14,117 | 39 |
| Indebtedness, stock | | 7,615 | 49 |
| Balance assets | | $6,501 | 90 |
| Real-estate assets | $7,850 00 | | |
| Real-estate mortgage | 5,000 00 | 2,850 | 00 |
| Assets in excess of liabilities | | $9,351 | 90 |

#### ( Continued.)

"June 2, '88. The mortgage was dated Aug. 8, '87,
but was not filed until Jan. 28, 1888. The note to which
the mortgage was collateral was due Nov. 5, 1887, so that
this nominal security was in reality not security for the
interval from Aug. 8, '87, to January 28, 1888. In the
mean time Mr. Platt had paid on the claim $2,265.23, so

that at the hour of filing there was due, plus the interest, $734.78. In the afternoon of the same day $9.25 more was paid.

" So far as Mr. Platt himself is concerned, we would not have doubted his integrity, and did not file the mortgage on that account, but to anticipate any other creditors, of whose number or extent we were not thoroughly informed. Have known Mr. Platt for some years, and have believed him personally to be a man with no bad habits nor expensive tastes, whose whole time was devoted to his business, and whose desire was to pay all his obligations. It is our opinion that one cause of his temporary embarrassment at the time of our loaning this money was the purchase of stock in the Benton Harbor Milling Company, and some other matters tending to build up and benefit this place. The milling stock is, we understand, good paying property, but it has taken the cash to pay for it."

" August 8, '88. Carries the largest stock in his line here. Has been heavily involved for some time, and came near making an assignment last winter, but instead executed a chattel mortgage to the Bank of Benton Harbor, securing $3,000, which was discharged from record after being nearly paid up, and bank took a mortgage on some real estate near Niles. Platt is treasurer of the Benton Harbor Milling Co., and owns $4,000 of the stock, which is hypothecated for a loan of $2,000. Is said to sell on very close margins and below cost on many articles, and it is not deemed probable that he is making any money. Is said to have a nominal surplus of 8 to $10,000, but is not regarded a very safe credit risk."

" Jan. 25, '89. Has a large trade, but is reckless in selling. Stock about $7,000. Is hard up, but not so much so as at one time. Worth about $10,000 above debts. 6–3–1–2."

With this statement as to Platt's financial standing, and with a rating in Dun's Commercial Agency of from $5,000 to $10,000 capital invested in his business, the plaintiff in this suit received a letter from Platt, dated February 3, 1889, requesting it to quote prices on its carriages, stating that he should probably sell a few very fine outfits that season, to which the plaintiff replied,

under date of February 10, stating prices, and terms of discount and credit. Afterwards the salesman of plaintiff called personally upon Mr. Platt, and on March 7, 1889, received his order, upon the terms of 90 days net, 5 per cent. 30 days. Two days later, Platt wrote plaintiff requesting it to add to the order three spiral-spring carts. Plaintiff commenced shipping the goods March 30, 1889, and made two more shipments in April, when, before the goods were all shipped and on April 29, Mr. Platt wrote plaintiff requesting it to cancel order for carts and buggies. It appears that, about the same time, defendant Platt canceled other orders which he had made for goods from other parties, for the reason that he became satisfied that he should not be able to pay for them.

The plaintiff clams that it sold the goods and extended the credit to defendant Platt solely upon the strength of the rating statement of Platt, and reports received from Dun & Co., above set out. It also claims that such statement was false and fraudulent, and made for the purpose of inducing plaintiff to sell to him upon credit, and that, on account of such fraud, it had a right to rescind the sale and reclaim the goods. Plaintiff also claims that Platt, at the time he purchased the goods of plaintiff, did not intend to pay for them. Accordingly the plaintiff sent its attorney to Benton Harbor, where he arrived on May 18, 1889. This was on Saturday. He called at the store, where he found Frank H. Platt, and was informed that George W. Platt was sick. He told Frank H. that he had heard that they had been putting some mortgages on the property there, and it was not looking just right, and he had come to see what there was about it. Frank H. told him they had given some mortgages, and, upon further inquiry, he stated to whom, and the amounts. He was told that the mortgages covered the whole stock, including the wagons, and he said to Frank

that they did not send the wagons to him to be mort-
gaged for old family debts, but they were sent supposing
Platt would sell them in the course of business, and then
pay for them.    He replied that they should pay their
debts; they expected to; they should get their money
upon their notes and accounts, and pay everything in
three months.   He then told him that he did not want
to make unnecessary trouble; that he did not like
the looks of things there; and if he thought he was
going to pay in three months, if he could give plaintiff
a note payable in six months, with an indorser, without
interest, it would be satisfactory to it.    It would give
him three months' extra time in case he did not get
around to pay all his debts.    Frank said he did not want
to do that.    Further conversation ensued, in which the
plaintiff's agent suggested that perhaps Platt could get
Mr. Tatman, who then held a chattel mortgage as secu-
rity for indorsing defendant's notes, to sign a note with
Platt for the debt due plaintiff, and he said he would
not want to do that.    The witness testified:

"I said to him: 'If you are not willing to do that,
I have not much faith in your talk about paying within
three months.   With these mortgages here, you cannot
expect us to be easy.'    Then I said to him: 'So we shall
have to reclaim our goods.   These wagons we shall take
back.'    That is what I was here for,—to reclaim these
wagons if the matter was not satisfactory, so we could
get the pay out of it."

It is claimed by defendants' counsel that this was such
a recognition of the contract relations between the parties
as amounted to a ratification of the contract of sale.    But
I do not think so.    It was a mere effort to get security
for payment of the debt.    Had he taken security, or
given a valid extension of time of payment, it would have
been different.    A person defrauded does not lose his
right to rescind by making an effort to compromise or

obtain pay for the property, unless he does some act which evinces a clear intention to waive his right to rescind.

For the purpose of showing the falsity of the statement made by Frank H. Platt of his father's financial standing on January 1, 1888, J. H. Breckenridge was introduced as a witness on the part of the plaintiff, and testified that he had been a book-keeper for 15 or 16 years at Joliet and Chicago, Ill., and had examined the books of account of George W. Platt with F. A. Hobbs. On his direct examination, he testified that on January 1, 1888, the books showed net assets $13,376.24, and that there was a difference between what the books showed and the statement of $9,313.88. He attempts to explain the method he pursued to reach his conclusion, which from his testimony is not very satisfactory. He deducts items which the books of George W. Platt show were in the banks at that date, because an examination of the books of the banks shows that certain checks had been charged up against the accounts, making a difference of $1,027.44; but it was shown that the checks had been used in reducing liabilities to that amount. He deducts $2,000 from real estate, for the reason that he finds from the cash-book the house and lot had been sold, and the proceeds put into the store, and a note given therefor to Jane E. Platt, which he puts with the liabilities. He admits that the accounts receivable, as shown by the books, were $4,926.94, and the bills receivable were $1,925.56, making a total of $6,852.50; and that in his *memoranda* he only called them $3,426.25; and that, counting them at their face, Platt would be worth $3,426.25 more than he had testified he was worth the day before.

It appears that this witness testified from *memoranda,* and that, upon adjournment of court in the evening before he was cross-examined, counsel for plaintiff furnised

defendants' attorney with a copy of some figures purporting to be those used by the witness. The next morning the court called upon counsel for defendants to produce such *memoranda* and have them marked as an exhibit. They had not been offered in evidence, and counsel for defendants did not admit them to be copies of the *memoranda* from which witness testified. Nevertheless the court insisted that they should be marked as an exhibit, to be printed with the record in case the cause should be taken to the Supreme Court, but should not be read in evidence or considered in evidence upon the trial. The court stated that he made "the order in view of Mr. Valentine's refusal last evening to admit that these figures were furnished by counsel." Exception was taken to such ruling. That this was error there can be no doubt, but, so far as we can see, it was harmless error. The exhibit is returned and printed in the record, but is not considered by this Court.

Error which was prejudicial was committed upon the examination of the witness F. A. Hobbs. He was a bookkeeper and coal-dealer, and lived in Benton Harbor. He assisted Breckenridge in the examination of the books, and, in testifying, made use of *memoranda,* and swore that he could not testify to the exact figures without the aid of the *memoranda,* and that he had used it to get at the exact figures throughout his direct examination; that all the figures upon it related to the examination of the books made by him and Breckenridge. Counsel for defendants requested the privilege of inspecting the paper to enable them to cross-examine the witness. Counsel for plaintiff refused, and the court sustained the objection. *Duncan v. Seeley,* 34 Mich. 369; *People v. Lyons,* 49 Id. 78.

G. L. Marchand, a witness produced by the defendants, testified that he has been an accountant since about 1871,

and had been employed by wholesale dealers of Chicago, and by the auditor of the state of Illinois; that he had examined the books of George W. Platt, with a view of ascertaining his assets and liabilities on January 1, 1888, January 1, 1889, and May 20, 1889. He produced detailed statements from which it appears that George W. Platt's net investment on January 1, 1888, was $24,533.68; on January 1, 1889, it was $10,835.82; and on May 20, 1889, it was $12,009.58; that the net shrinkage in the assets between January 1, 1888, and May, 1889, was $12,524.10, and he gave the items by which he accounted for such shrinkage. He also testified that " G  3½ " represented a rating in Dun's Commercial Agency; that the letter " G " is supposed to represent the amount of capital invested, and stands for from $5,000 to $10,000. " 3½ " refers to his credit, and means "fair."

The statement and reports accompanying sent out by Dun & Co., and received and acted upon by plaintiff, afforded, under the testimony in this case, no ground whatever for rescinding the contract of sale. The last report, dated January 25, 1889, was that George W. Platt had a large trade, but was reckless in selling; that he had a stock of about $7,000; that he was hard up, but not so much so as at one time,—worth about $10,000 above debts. The jury were asked to find, and returned that they found, that, in making the sale, the plaintiff relied upon the R. G. Dun & Co. report in evidence; and they further found that George W. Platt was worth, at the time he made the contract for the goods in question, $5,000, or more, over and above all his liabilities, and that when he purchased such goods, he intended to pay for them. Taking the whole of the reports made by Dun & Co., the facts therein shown to exist correspond with this finding of the jury. There was ample testimony in

the case to justify such finding, and the court should have charged the jury that unless the testimony satisfied them that, at the time George W. Platt purchased the goods, he did not intend to pay for them, or unless they were satisfied from the testimony that, at the time he purchased the goods, there was a substantial difference between the report of Dun & Co. as to his financial standing and his actual financial condition at that time, so great as to convince them it was the intention of George W. Platt to defraud the plaintiff by obtaining such goods upon credit, then their verdict should be for the defendants.

This Court has not gone so far in any case as to hold that traders must report to the mercantile agencies every variation in their circumstances. It is only when they are in an insolvent condition, and are or should be aware that they will be obliged to suspend or fail in their business, that they owe it as a duty to creditors, or those they solicit to deal with them upon credit, to inform them of their situation, or to notify the commercial agencies of their change of situation. Purchases not made in good faith, while in such straits, may well be regarded as fraudulent. But no fraud can be predicated upon the fact that a merchant or trader makes a representation of his standing which is truthful at the time to a commercial agency, and thereby obtains credit. If a considerable time elapses, and no new statements are made, and no new representations as to his standing, it cannot be said that, if his condition has changed, he is guilty of actual fraud, unless he knows, or the circumstances are such that he should know, that the credit is extended upon the strength of the original rating of the commercial agency. Fraud is a question of fact to be deduced from all the circumstances, and a vendor cannot shut his eyes to the subsequent reports of the commercial agencies tending to

cast doubt and suspicion upon the financial ability and credit of a merchant or trader, and rely upon a statement by such person made a year before.

The court correctly instructed the jury, as a matter of law, that the plaintiff had a right to rely upon such report, inasmuch as Platt himself had made a statement to R. G. Dun & Co., but that it must be presumed that the plaintiff, if it relied at all upon the report, relied upon the report sent by R. G. Dun & Co. as a whole, and not upon any particular part of it. But the court immediately after proceeded, inadvertently, it may be presumed, to instruct the jury as follows:

"Now, then, gentlemen, if Geo. W. Platt on January 1, 1888, was worth a material sum less than appears from the representations made by Frank to R. G. Dun & Co., and if plaintiff, when shipping the wagons, relied upon such statement, and shipped them on the strength of such statement, and if, when the wagons in question were shipped, Geo. W. Platt's pecuniary affairs were materially worse than was disclosed in the report of R. G. Dun & Co. as a whole, this plaintiff had the right to rescind the contract of sale, and to take back all wagons not sold to *bona fide* purchasers, no matter whether Frank H. Platt did or did not intend to make a false statement to R. G. Dun & Co."

Here the statement made by Frank H. Platt is given undue prominence, and the jury are told that if plaintiff relied on this statement, instead of the report as a whole, as he should have charged, then the plaintiff could rescind. It is true that this error was modified subsequently by including the whole report, as an inducement to the sale; but we cannot say that the jury did not give weight to this portion of the charge, more especially as we cannot otherwise conceive of any basis for a general verdict for the plaintiff. The special finding above stated required that the general verdict should have been rendered for the defendants. It is the only one that can be

rendered consistent with the special findings. This view of the merits renders it unnecessary to discuss many of the errors assigned upon the record.

The defendants' counsel moved the court that judgment be entered for the defendants upon the special findings of the jury, which motion the court refused, and instead rendered a judgment for the plaintiff upon the general verdict.

The judgment must be reversed, and the cause remanded, with instructions to the trial court to vacate and set aside the judgment for plaintiff, and to render judgment in favor of defendants, to the end that such further proceedings may be had therein governing the action of replevin as the statute requires. The defendants are entitled to the costs of both courts.

The other Justices concurred.