## MONIER et al. v. GUARANTY TRUST CO. OF NEW YORK.*

No. 134.

Circuit Court of Appeals, Second Circuit.
Feb. 10, 1936.

L. HAND, Circuit Judge, dissenting.

———◆———

*Writ of certiorari denied 56 S. Ct. 835, 80 L. Ed. ——.

Armstrong & Keith, of New York City (Lorenzo D. Armstrong, John S. Keith, Joseph W. Murphy, and Arthur M. Boal, all of New York City, of counsel), for plaintiffs.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Theodore Kiendl, Ralph M. Carson, Harold W. Bissell, and Franklin H. Mills, all of New York City, of counsel), for defendant.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The plaintiffs, trading as R. H. Hooper & Co., were formerly engaged in business as cotton brokers, having their main office in New York City and a branch office in Havre, France. They carried a checking account in the defendant bank. On June 17, 1930, the bank dishonored certain checks drawn by the plaintiffs on this account and payable to members of the Cotton Exchange, and this resulted, the plaintiffs charge, in their suspension from the exchange and the enforced liquidation of their business. Their creditors were paid in full, but their business was destroyed, and for the damages so caused, averred to be $1,549,040.65, they brought this action in the court below. Jurisdiction is grounded on diverse citizenship.

The bank admits that it dishonored the plaintiffs' checks but contends that they had no credit balance in their account when the checks were presented. This turns on whether the bank was justified in charging against the plaintiffs' account on June 17, 1930, the amount of a loan of $75,000 which was not due until the next day. If this charge was properly made, there were no funds available for payment of the checks; otherwise, they were wrongfully dishonored. The bank asserts that the loan had been procured under circumstances which gave it a right to rescind the contract of loan and that it exercised this right in making the charge against the plaintiffs' account. It also relies on an account stated subsequent to the disputed charge. These issues were transferred to the equity side of the court for trial. The grounds for rescission were pleaded in the defendant's second to seventh affirmative defenses and the account stated in its eighth defense. The trial resulted in a decree sustaining the sixth and seventh defenses and dismissing the others as not proved. The plaintiffs have appealed from the decree, and the judgment entered thereon in so far as it sustains the sixth and seventh defenses and dismisses the complaint; the defendant has appealed from the dismissal of its second and eighth defenses.

There is substantially no material conflict in the testimony as to the circumstances under which the loan was made. Plaintiffs' firm and its predecessors had been long in business and enjoyed a reputation of the highest standing. The bank had offered them a line of unsecured credit of which they had not previously availed. On June 13th Mr. McLaren, manager of the plaintiffs' New York office, telephoned to Mr. Sample, a vice president of the defendant, requesting a loan of $75,000 for a few days. The latter asked for a more recent financial statement than that of December, 1928, which was the latest contained in the credit file of the bank. Mr. McLaren sent over an audited statement showing the firm's net worth as of March 31, 1930. After examining the statement Mr. Sample telephoned his consent to the loan and asked the reason for it, to which Mr. McLaren replied that there had been a decline in the market, remittances from clients abroad were delayed, and the money was needed for a few days pending the receipt of such remittances. He sent to the bank an ordinary five day note for $75,000 made out on a stationer's blank form. Whether the negotiations were concluded in a single telephone conversation, as McLaren says, or in several, as Sample testified, is immaterial. Both agree that the loan was made about 11 a. m. on June 13th, when the note was discounted and $75,000 less the five-day discount of $46.88 credited to the plaintiffs' account.

The second affirmative defense in the bank's amended answer asserted the right

to rescind the contract of loan on the ground that the statement of March 31st misrepresented the plaintiffs' net capital worth as of that date. The net worth shown was approximately $463,000, and the defendant claims that it was overstated by $28,562.14. This sum is claimed to represent the losses then accrued because of the speculations of Gerout, the plaintiffs' office manager at Havre, carried on in an account in the name of J. Candon. Candon was once a customer of the Havre office and his account genuine, but at some time Gerout began to speculate in the name of Candon. The record is barren, however, of any showing that these speculations commenced before March 31st or that the Candon account was not then genuine. Indeed, the audit by London accountants, whose practice was to obtain confirmation signatures from the Havre customers in connection with their monthly audits, tends to prove that the account was then genuine. Even if it be assumed that the Candon account was Gerout's on March 31st, we should agree with the trial judge that the claimed discrepancy of $28,000 in a balance sheet showing a net worth of $463,000 would not prevent the statement from being substantially correct particularly when $30,000 was subsequently collected from the defaulting Gerout and his surety. The second defense was properly dismissed for failure of proof.

■ But if the statement speaks as of June 13th, when it was submitted to the bank, it was clearly false, for by this time Gerout's speculations in July cotton had actually depleted the plaintiffs' resources by some $200,000, although they were still ignorant of his wrongdoing. At least their ignorance may be assumed for purposes of the bank's next contention, set forth in its sixth affirmative defense. This contention is that when the plaintiffs gave their March 31st statement to Sample it carried an implied representation that "this fairly reflects our present condition on June 13th." Such an implication from the mere handing over of a financial statement is not, in our opinion, justified. The statement on its face shows that it represents conditions on a certain date. Any material falsity in the facts asserted as existing on that date would be ground for rescinding a loan made in reliance on the statement, regardless of the borrower's innocence in making the false assertion. Taylor v. Burr Printing Co., 26

F.(2d) 331, 333 (C.C.A.2); Seneca Wire & Mfg. Co. v. Leach & Co., 247 N.Y. 1, 159 N.E. 700. But the statement does not purport to assert the exact situation on the date when it is handed to the prospective lender. Both parties know there must have been changes in the ordinary course of business. Du Pont, etc., Co. v. Schwenger, 90 Misc. 678, 682, 154 N.Y.S. 186. Since the one seeking credit is aware that the other is relying on the supposition that there have been no changes, of a character likely to affect his action, the borrower must disclose any detrimental changes of which he knows. Not to do so would be a fraudulent concealment. Stewart v. Wyoming Ranch Co., 128 U.S. 383, 388, 9 S.Ct. 101, 32 L.Ed. 439; Loewer v. Harris, 57 F. 368, 373 (C.C.A.2). But we cannot think that the business community regards the man seeking credit as making a warranty or a representation implied in fact that there has not occurred without his knowledge any detrimental change in the conditions shown on his statement of prior date. If the lender wants such assurance, he can demand it. Not infrequently a statement contains a provision that it may be deemed to continue to reflect the financial condition unless notification is given to the contrary. Gerdes v. Lustgarten, 266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309; In re B. & R. Glove Corporation, 279 F. 372 (C.C.A.2); Atlas Shoe Co. v. Bechard, 102 Me. 197, 66 A. 390, 10 L.R.A.(N.S.) 245. In the absence of such a provision, or of a demand by the lender for such assurance, or of written or spoken words by the borrower from which such assurance may be inferred, the reasonable understanding is that the financial statement speaks as of its date, and that the borrower is charged only with the duty of not concealing material changes of which he knows or is charged with knowing. Gerout's knowledge is not imputable to the plaintiffs since he was engaged in defrauding them. Without discussing each of the authorities relied upon by the bank it will suffice to state that in our opinion they do not establish any different standard than that above stated. See Mooney v. Davis, 75 Mich. 188, 42 N.W. 802, 13 Am.St.Rep. 425; Cortland Mfg. Co. v. Platt, 83 Mich. 419, 430, 47 N.W. 330; Strickland v. Willis (Tex.Civ.App.) 43 S.W. 602; In re Marks & Co., 218 F. 453 (C.C.A.2). Nor do we so read the treatises referred to as

asserting a more severe doctrine. Black, Rescission, § 73; Williston, Contracts, § 1579, footnote 90.

█ Although the mere submission to the bank of the statement of March 31st involved no representation as to the plaintiffs' condition on June 13th, the question remains whether McLaren's conversation with Sample regarding the loan involved any such representation. In giving his reasons for the loan McLaren stated that remittances from clients abroad were delayed and, according to Sample, that the money was wanted to tide the firm over the week-end "pending the receipt of these remittances." The bank's argument suggests that this reference to clients abroad and to the plaintiffs' expectation of remittances from them was equivalent to a representation that their accounts were collectible and properly margined in accordance with rule 33 of the New York Cotton Exchange. This rule prohibited unsecured credit to a customer in excess of $10,000. The security must be cash or marketable collateral. As to the most important account which Gerout carried in the name of Candon, this was not true. But a representation that money will be received from clients in a few days is not a warranty that they will pay as expected; nor do we think that it can be construed as a representation that all accounts on the books are properly margined. If it were, then every cotton broker could likewise be charged with making such a representation by merely applying for credit to a person who knew he was a cotton broker and was familiar with the rules of the exchange. No doubt such a broker represents to those with whom he deals that he is in good faith attempting to conduct his business in accordance with such rules, but to say that he has misrepresented the facts if a trusted employee, without his knowledge, has failed to require adequate security from a client, or has defrauded him by personal speculation, implies more than can fairly be thought to be in the mind of either party. The rule of the exchange has reference to a voluntary extension of credit; one does not speak of extending credit to an employee who is secretly defrauding him. Moreover, McLaren did not refer specifically to the Candon account, and his general explanation that he needed the loan for a few days until remittances were received from abroad was explanatory of his reasons for borrowing rather than a representation of any existing fact upon which the lender might be expected to rely. We are satisfied that no representation was made to the bank other than appeared on the face of the balance sheet of March 31st.

█ The bank also contends that at the time of the loan the plaintiffs had already learned that they had reason to expect a serious loss on the Candon account and were guilty of fraudulent concealment in not disclosing to the bank their doubts concerning it. So the district judge found; but as this conclusion rests altogether on cabled messages passing between the plaintiffs' New York and Havre offices the trial judge had no better opportunity to determine the fact than have we, and his finding, though entitled to respect, is less controlling than it would be if based on the testimony of witnesses. The cabled messages must be read in the light of the manner in which the Havre business was conducted, and it must be remembered that Gerout was a trusted employee of nearly seven years' standing whose honesty there had never been any occasion to suspect during that time. Buy and sell orders for Havre customers were cabled daily to the New York office for execution, but only the aggregate of purchases or sales was given and usually without the customers' names. The Havre office orders were lumped as a single account in the daily records kept in the New York office. Detailed reports, however, were mailed weekly and monthly audits of the Havre office were made by a firm of London accountants. A letter from these auditors dated May 20, 1930, showed the Candon account margined within the rule of the exchange on April 30th. From June 1 to June 9 the market price of cotton was declining, and on the latter date it suffered a decline of half a cent a pound. The Havre office debit was then between $75,000 and $100,000. Gerout's business was to see that the Havre accounts were kept margined within the $10,000 credit limit of the rule of the exchange and it was to be assumed that on a falling market he would collect margins. If collected in cash he should be able to make remittances. On the morning of June 10th the plaintiffs cabled the Havre office: "Advise of amount of remittance. Funds needed." At 1:23 p. m. a second message was sent:

"Anxiously awaiting reply to our telegram of today remittance. What is the condition of accounts." To which a reply was immediately received stating that remittance was delayed too late for bank and would be sent tomorrow. The next morning $35,000 was received from Havre, and the plaintiffs cabled: "Why can you not collect additional margin? Remittance very disappointing. What is the condition of accounts." A prompt reply stated "Accounts O. K. Will remit more as soon as possible." The market continued to decline. On June 12 a cable was sent asking, "Why can you not remit," and a reply received that: "We had many payments settlements to do. Will remit when possible." The final three cablegrams prior to the plaintiffs' loan from the bank read as follows:

Cable to Havre sent June 12 at 1:57 p. m.: "Your account at present values shows a balance in our favor of $200,-000 approximately. Cannot understand why you have not remitted very much more. What is the standing of Candon. Have you sufficient margin. Telegraph details of."

Cable from Havre received June 13, at 9:51 a. m.: "Candon first class credit. Sufficient margin received. Coffee decline forced to deny [a meaningless sentence due to error in coding] Will remit as soon as possible."

Cable from Havre received June 13, at 10:11 a. m.: "Remitted $10,000 Guaranty Trust Co. Security to be sold. Hope will be able to remit at the beginning of next week."

It was immediately after receipt of the last-quoted message that McLaren, after consulting Mr. Story, applied for the loan. The plaintiffs' knowledge as to conditions in Havre must, of course, be judged by what they then knew, not by what later developed. They knew that the Havre office had not remitted as much as was to be expected if margins were being collected. The Candon account, because of its size, had attracted their attention, and Gerout had stated explicitly that it was a first-class credit and sufficiently margined. He had explained his failure to remit by saying he had had settlement payments to make (which would account only in part for the absence of larger remittances) and that security was to be sold, which meant that some customer or customers had put up securities

instead of cash when margins had been called for during the falling market. Remembering that the plaintiffs were dealing with a trusted employee, it seems to us that the natural interpretation of the situation was to take the cables at their face value, as they testified they did; and that a finding that they already realized they were in the process of suffering a serious loss imputes to them a suspicion of the honesty of their employee which they did not entertain, and as yet had no reason to.

The bank lays stress upon the actions of the plaintiffs after getting the loan. Immediately thereafter they cabled for details of the Candon account, asked if the Havre office had sufficient security in its possession, and said "the account will be closed if they do not pay. Remit before close June 17." This cable was directed to the assistant manager, whose principal duty was to watch customers' margins. A reply was promptly received giving Candon's open contracts, stating that the security was sufficient but that time would be necessary to realize on it. At 4 p. m. on the 13th the plaintiffs instructed the Havre office to have the Guaranty Trust Company at Havre verify the market value of the securities, and asked why a loan could not be made against them. On the 14th and 16th they sold out the Candon account. This subsequent conduct indicates that when they learned that the account was margined by securities which were to be sold, they wanted details of the contracts and stated that the account would be closed if the security could not be realized by the 17th, and when details were given and they were told the security would be slow they suggested borrowing against it, and this not being done, they exercised their right to close out the account. We cannot construe this conduct as indicating that on the morning of the 13th the plaintiffs had already lost confidence in Gerout or doubted the existence of the security. Had they doubted it even in the afternoon, they would almost certainly have closed the account at once rather than giving instructions to have it valued and risking an increase in their loss by a further decline in the market. As we view the evidence it is impossible to say that the plaintiffs did not use complete good faith in dealing with the bank. Sample himself does not suggest the contrary. We cannot, therefore, accept the finding that

there was a failure to disclose material facts which justified a rescission. The seventh affirmative defense should not have been sustained.

The bank's final contention relates to the eighth defense, an account stated. After the firm's suspension and when auditors were examining their affairs, McLaren on June 19th telephoned the bank for a statement of the firm's current account, stating that the auditors had requested it. The statement on the bank's regular form showed a charge of $75,000 on June 17th, resulting in an overdraft of $631.29, and subsequent credits and debits, leaving a balance of $2,216.34 on June 18. It was delivered together with the cancelled checks and note. At the bottom it contained the customary legend: "Please examine statement and vouchers. If no reply be made within ten days, the account will be considered correct." No objection to the statement was ever made. The defendant argues that the plaintiffs thus acquiesced in the account rendered and accepted the charge to their account on June 17th in payment of the note, and that the propriety of charging off the note having thus been settled between the parties, the plaintiffs are precluded from now claiming it was illegally done and the dishonor wrongful of the checks subsequently presented. The court below was correct in rejecting this argument. The statement made no reference to the plaintiffs' claim for wrongful dishonor and there is no ground whatever for supposing that this independent unliquidated claim was intended to be, or was, settled. Chamley v. Sibley, 73 F. 980, 983 (C.C.A.7); Vachon & Sterling v. Northern Nav. Co., 241 F. 866, 867 (C.C.A.9); Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 512, 114 N.E. 846, 3 A.L.R. 287. At the most the account rendered was only a statement of the balance owing on June 18, and as such properly included a debit of $75,000 on account of the note, for the note had then matured. In determining such balance it was immaterial whether the note was charged on the 17th or the 18th; and in any event the plaintiffs having already objected to the charge on the earlier date were not required to protest again. Cf. Topas v. John MacGregor Grant, Inc., 18 F.(2d) 724, 725, 52 A.L.R. 807 (C.C.A.2).

For the foregoing reasons the decree must be modified to dismiss as not proven all of the defenses heard on the equity side and the judgment dismissing the complaint in the action at law must be reversed and the cause remanded for trial. The plaintiffs are entitled to costs on their own appeal and on the defendant's.

L. HAND, Circuit Judge, dissents.

L. HAND, Circuit Judge (dissenting).

I agree that when McLaren delivered to Sample the financial statement, audited as of March 31st, he should not be understood to have guaranteed that the figures still held good, or that the plaintiffs' net worth was as great as it had then been. On its face it was the work of professional accountants, the result of an examination of the books such as accountants alone can make. Had it been less authoritative—made up from trial balances for instance—its later use might have meant more; but as it was, I think that Sample ought to have understood only that McLaren believed it to be still true in substance. I do not read what we are deciding as more than that in these particular circumstances the transaction had only that significance; we are not committing ourselves generally as to the consequences of delivering any financial statement which bears an earlier date. I also agree that the telegrams exchanged between the plaintiffs and their Havre office, although they might well have aroused suspicion, were not plain enough to put them on notice of Gerout's thefts. But I cannot put the same interpretation as my brothers upon the talk between McLaren and Sample on the day that the note was made. When Sample asked him why he wanted the money, McLaren answered in substance that he needed it only over the week-end in which there was a holiday or perhaps two, at the end of which he expected remittances. The two versions differ a little, but it is plain that the men were talking about foreign remittances and that these were to come from customers' accounts; what they said came to this; that the plaintiffs expected their Havre customers to pay $75,000 by the time the note fell due. Of course I do not suggest that this was an engagement by McLaren that these accounts would be paid; Sample had to take his chances as to that; but I cannot escape the conclusion that it was a declaration that the firm in fact had that much in foreign customers' accounts. That was not true; there were indeed foreign ac-

257

counts, but not in such quantity. Such a declaration says more than the bare declaration that one is a cotton broker; a cotton broker may have millions of accounts or he may have none; a prospective lender learns from that nothing of substance to guide his decision; he learns a great deal when the borrower tells him that he has accounts equal to the loan which he can collect before it falls due.

Therefore it seems to me that McLaren misstated a material existing fact. It is true that without these accounts, that is to say, in spite of Grout's defalcation, the plaintiffs were solvent, but eventual solvency is very different to a lender from customers' accounts, secured by the margin required by custom and the rules of the exchange. That Sample relied upon the information I do not understand my brothers to question; in any case it seems to me plain, though he also relied upon the financial statement. If he did, it makes no difference whether one views the resulting legal relations as dependent upon a mutual mistake of fact, or as being a statement by the borrower intended to be relied upon by the lender and in effect a warranty. It is perhaps simpler and less involved, to use the first pattern. Both McLaren and Sample were mistaken as to the existence of the Havre accounts; their mutual mistake had been one of the circumstances on which the lender had acted, which determined his decision, at least so the evidence is as it stands. If the plaintiffs mean to contend that the loan would have gone through in spite of McLaren's assurance about the accounts, they should have proved it. When Sample learned of this mistake he was justified in rescinding; he did rescind for that reason, I believe, though the evidence is not so clear as it might be on that issue. For these reasons I think that the judgment ought to be affirmed.