## FITZGERALD v. McFADDEN et al.
### No. 269.

Circuit Court of Appeals, Second Circuit.
March 15, 1937.

Edwin V. Hellawell, of New York City, for appellant.

O'Connor & Farber, of New York City (W. Lee Helms and Arnold T. Koch, both of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree in equity, dismissing a bill between co-adventurers. The facts are as follows: The defendant, McFadden, in the summer of 1931, by his solicitor, the defendant, Helms, filed an application for a patent on a process for cleaning ships' oil tanks. The plaintiff, Fitzgerald, who had lived in Georgia, and had been engaged all his life in shipping, met McFadden and Helms on November 18th, 1931, and they interested him in a project to exploit this invention. The three had a number of interviews and came to an agreement, on December 14, 1931, by which Fitzgerald, on behalf of himself and one, Meseck, was to pay $5,-000 to McFadden for an interest in the invention; Fitzgerald was to advance $3,000 to a corporation, the Sealand Process Company, which was to be organized to exploit the patent in the Port of New York; Fitzgerald and McFadden were to contribute between $3,000 and $5,000 toward the expenses of a second company to be organized, to which the patent was to be assigned; and Meseck was to turn over a tug for the use of the Sealand Company. Of the $5,000 later paid to McFadden, $2,-500 came from Meseck; but Meseck's tug was apparently thought the equivalent of Fitzgerald's financing of the Sealand Company. In consideration of these promises McFadden and Helms agreed to license the Sealand Company for the Port of New York, and to give Fitzgerald and Meseck jointly thirty-one per cent. of its shares; McFadden was to have fifty-one per cent. and the other eighteen per cent. was to be distributed between Helms and two others. The shares of the holding company when formed were to be divided in the same proportions. Fitzgerald paid $1,000 to McFadden on December fourteenth and the rest of the $5,000 later; just when, the record does not show. The Sealand Process Company was formed in December, and Fitzgerald advanced between $2,-700 and $2,800 to finance it. Again the dates are left uncertain.

Fitzgerald swore that at their first meeting he inquired of Helms whether McFadden's invention was patentable, and that Helms answered: "I have made thorough searches of the records in Washington, both foreign and American, and it is new and novel and there has never been anything like it." However, Fitzgerald appears not to have relied upon this, for he insisted upon a patent lawyer of his own, and on Helms's recommendation he retained one, Hutchinson, a Washington correspondent of Cooper, Kerr & Dunham, a well known New York firm. He went to Washington with Helms on December sixteenth, but he did not personally see Hutchinson; Helms did, and asked him to complete a search in two days. Hutchinson did what he could, and Cooper, Kerr & Dunham reported the

result to Helms on December twenty-fourth, saying that they had not been able to give the necessary time to determine whether the invention was patentable, but that it did not infringe any of ten patents which they enumerated. On November 17, 1931, three months after McFadden had filed his application, a patent issued on an earlier application to an Englishman named Freeman, for a process of "degreasing the interior" of ships' condensers and the like. On or about January 1, 1932, Helms learned of this, and at once perceived its importance, for he began to bargain for it with the American owners, and on January nineteenth he offered twenty-five hundred dollars for it; and McFadden bought it for himself in May and has held it ever since as his personal property. On February twenty-fourth the patent examiner cited it against McFadden's application; that reference has never been overcome, and up to the time of the trial McFadden had received no patent. ·

The parties began to draw apart in the spring of 1932, and had come to a breach by the summer; it is probable that Fitzgerald was already contemplating taking out a patent of his own, which he too meant to keep for himself; but there is no evidence that he knew of the Freeman patent. On the fifteenth of July, 1932, he and Meseck, McFadden, Helms and the two other parties to the project, all entered into an agreement by which they released one another from all obligations; and under which Meseck and Fitzgerald gave back their shares in the Sealand Company; Meseck received back his tug; and Fitzgerald got a license under the McFadden patent, when issued, for the states of Pennsylvania, Delaware and Maryland. Four days later Fitzgerald learned of the Freeman patent, and, on the second of August, that McFadden had bought it. He says that during the same month he tendered back the license to Helms and demanded his money, but this Helms denied, and the judge made no finding as to where the truth lay between them. On the twenty-second of March, 1933, he filed the bill at bar, seeking (1.) to charge McFadden with a constructive trust of the Freeman patent; (2.), to recover any surplus of what he had paid him that had not gone into it; and (3.) all advances that he had made to finance the Sealand Process Company. The defendants pleaded the release of July 15, 1932, as a bar, and Fitzgerald replied that it had been procured by fraud.

While the suit was pending the Navy Department had become interested in the exploitation of the invention for its vessels, and opened negotiations with both parties; with McFadden, as owner of the Freeman patent·and of his own application, and with Fitzgerald as licensee of McFadden in three states, and as patentee of his own patent which had meanwhile issued. The Department secured licenses from both, and paid down $15,000, of which Fitzgerald got a third. Eighteen months before this contract was made, but apparently while the negotiations were pending, they agreed that any arrangement with the Navy Department should be "without prejudice to any and all rights and contentions in any present litigation * * * respecting said patents and applications * * * and further without prejudice to * * * all claims of the respective parties hereto except as to the rights and obligations created by this instrument."

So much of the bill as seeks to impress a constructive trust upon the Freeman patent on the theory that McFadden had bought it with Fitzgerald's money, must fall because the judge found that all the money which McFadden used, came from elsewhere. McFadden swore in detail as to how he got it, and the judge, who saw him, believed what he said; his judgment on such an issue was better than ours can be. Upon this appeal Fitzgerald also insists that, no matter whose money purchased the Freeman patent, McFadden and Helms, as co-adventurers in the enterprise, might not buy it in for themselves and hold it as their own. Assuming this to be true, it will not serve Fitzgerald in this suit, because the limit of any relief which those facts would justify, is that McFadden should transfer the patent to the proposed holding company, and give the Sealand Process Company a license under it. Fitzgerald does not want that; he does not suggest that he again become a shareholder of the Sealand Company, or that McFadden proceed to organize the holding company; rather, the very demand for a transfer of the Freeman patent presupposed that he disaffirmed the contract, that the consideration should be restored and that he could trace it into another form. The remainder of the bill is to recover the payments to McFadden which did not go into the Freeman patent; as well as the payments to finance

the Sealand Company. As to the first, like the demand for the Freeman patent, it presupposed a disaffirmance of the original contract without which the consideration could not be recovered. The allegations support such a cause of suit; they are that McFadden and Helms deceived Fitzgerald about the validity of McFadden's invention. The evidence does not, however, prove that when the contract was closed on December 14, 1931, Helms knew of the Freeman patent; he may not have, for it had issued less than a month before. We cannot say, therefore, that there was any fraud in the inception of the contract. Moreover, if it had been once definitely closed, and if there be no implied representation in selling a patent application that a patent will issue, Fitzgerald could not have disaffirmed, merely because Helms learned of the Freeman patent thereafter. The law is indeed settled that if one buys an issued patent and it turns out later to be invalid, the buyer may disaffirm. Darst v. Brockway, 11 Ohio, 462; Herzog v. Heyman, 151 N.Y. 587, 45 N.E. 1127, 56 Am.St.Rep. 646; Harlow v. Putnam, 124 Mass. 553; Keith v. Hobbs, 69 Mo. 84. But it does not follow that the same doctrine applies to a patent application, which is necessarily a gamble anyway. However, we need not decide that here, because of the particular circumstances. We have already quoted what Fitzgerald said that Helms told him about McFadden's invention. Helms disputed this in part, and though Meseck corroborated Fitzgerald, we will arguendo accept Helms's version; at least he had told Fitzgerald that he had made a search and had found nothing. That gave Fitzgerald an assurance that, so far as Helms knew, the invention was valid.

■ But, as we have said, Fitzgerald did not rely upon this; he retained Hutchinson to search and report to him. Although that was after the contract was closed and after he had paid down $1,000, it is obvious that he could only have meant that, in case the report turned out bad, he should have the power to withdraw. No other reasonable interpretation of it is possible. Nevertheless had Fitzgerald made his decision after consulting his own lawyer, that would have ended it. He did not; it was Helms who got Hutchinson's report from Cooper, Kerr & Dunham. He got it about December twenty-fourth and kept it till January 21, 1932, three weeks after he had learned

of the Freeman patent. Now it is true that the report refused to pass upon the validity of McFadden's invention because of too little time; but for that very reason Helms must have understood that if Fitzgerald continued in the project, he was relying in some measure upon what Helms had told him, when he said that he had searched and found nothing. Fitzgerald had consulted him and certainly expected some expert advice. When he sent on the report, knowing of the Freeman patent, it was a deceit unless that patent did not impair or substantially affect McFadden's invention. Further, the report said that McFadden's disclosure did not infringe any of the ten patents mentioned. If it infringed Freeman's claims, it was an even plainer fraud to suppress its discovery. Embarrassed for these reasons, Helms and McFadden tried upon the trial to belittle the Freeman patent and say that McFadden's process did not infringe it. That was altogether contradictory to Helms's letter to Hutchinson, complaining that Hutchinson had not discovered it; Helms then thought it "exceedingly pertinent" to McFadden's application and that opinion is confirmed by its repeated citation against the application. But quite aside from these evidences of its importance, a comparison leaves no doubt of its critical character. Taken as disclosure it anticipated every one of McFadden's claims on file during the first six months of 1932, provided it covered "oil tanks" and the use of tetrachloride. It did both. It was said to cover "condensers and other structures which are not easily accessible"; and indeed that clause was not necessary anyway, because McFadden's claims would at best have been only for a new use. It used trichlorethylene, but McFadden expressly made that an equivalent of tetrachloride. Limited claims might conceivably have been drawn which would escape; perhaps they still can be; but as the application stood, it was void; and at best any possible value which it could have, was very circumscribed. Furthermore, it is very doubtful whether one could practise McFadden's process at all without infringing Freeman's claims. "Heat exchange apparatus" was defined at page 2, lines 38–44, as covering any surfaces "difficult of access"; the inside of oil tanks were such surfaces. Certainly infringement was very likely, and every consideration of honesty demanded that Fitzgerald should be allowed to judge for himself.

Therefore, Helms and McFadden—who was chargeable with Helms's fraud—deceived Fitzgerald while he still could withdraw, and their fraud extended his privilege until he should learn of the Freeman patent. He may recover what he paid unless there be some bar to the suit.

The first defence is the release of July 15, 1932. The fraud invalidated this as well as the contract, unless Fitzgerald had learned of the Freeman patent meanwhile. There is no direct evidence that he had, and the defendants have the affirmative. True, the judge made no finding on the issue, and there is some ground to suspect that the patent may have earlier come to Fitzgerald's attention. He was already trying to secure a patent of his own, and had retained a solicitor to make some sort of search, and, as we have said, four days after the release this attorney did report the patent to him. Yet this does not seem to us enough to carry the defendants' burden and the right to disaffirm the release like that to disaffirm the contract still persisted. The judge thought, however, that Fitzgerald's delay after learning of the Freeman patent barred disaffirmance. We cannot agree; not even though he did nothing until March, 1933, when the bill was filed. The defendants had not acted to their detriment in reliance upon his inaction, and seven months is too short a time to infer actual ratification in the absence of some affirmative act. Indeed, Fitzgerald swore that he demanded his money back in August, but Helms denied it, and since the judge would make no finding, we will assume that no demand was made. There is a passage in his testimony which may be read as saying that at one time in some negotiations with the Dupont Company about his own patent he had offered them his license under the McFadden patent; but it is very confusing, not plain enough to prove that he did offer that license. All he meant to say, apparently, was that the Dupont Company had told him that the Freeman patent underlay all the rest. Nothing but such an offer would be a ratification; he needed no license to practise the invention before a patent issued, if he knew it. The record does not disclose whether the process was ever disclosed to him; originally it was a secret, but after the contract was closed he may have learned it. If he did, he did not learn it as a result of the release; if he did not, it does not appear

that it was disclosed to him as part of the consideration for the release; if it was so disclosed, it does not appear that he ever practised it. We can therefore find no evidence of ratification after discovery of the fraud except the delay; and the defendants had the burden of the issue. There is another passage in his testimony which seems to say that he had been offered back his money, but a reading of the whole makes it plain that he did not mean this; and the defendants apparently understood that he did not.

The judge also sustained the defence that Fitzgerald never tendered back his license or Meseck's tug and that for this reason too he could not disaffirm the release. First, it is to be observed that his tender, even if any were necessary before suit, which it was not would not have included the tug. We have already said that Fitzgerald wants only to disaffirm the contract not to have it reinstated, and the conditions upon one are not the same as upon the other. We can consider the question most clearly by supposing that the two disaffirmances took place in sequence; if the defendants are restored to whatever they should have at the end of both, there is no reason to go through the intermediate steps. To disaffirm the release and get the contract reinstated, Fitzgerald would have to cancel his personal license and Meseck to return his tug; but that was all that both received. Thereupon they would have become entitled to thirty-one per cent. of the Sealand shares and their former status as co-adventurers in the project, being still liable, however, to finance the holding company when formed. If in that posture they had sought to disaffirm the contract they would have had to surrender the Sealand shares; would have become jointly entitled to $5,000; Meseck would have got back his tug; and Fitzgerald his advances to the Sealand Company. Thus at the end of both disaffirmances they would have been exactly where they will be now, if their money is refunded; and McFadden and Helms would have nothing they do not now have, except Fitzgerald's personal license. The restoration of that and that alone is the only condition; and it was not necessary to tender that in advance of filing the bill, for the decree can take care of it. MacNamee v. Bankers' Union, etc., 25 F.(2d) 614, 618 (C.C.A.2); Twin Lakes L. & W. Co. v. Dohner, 242 F. 399, 402 (C.C.A.6); Plews v. Burrage, 274

F. 881, 885 (C.C.A.1); Thomas v. Beals, 154 Mass. 51, 27 N.E. 1004; O'Neill v. Kunkle, 244 Mich. 653, 222 N.W. 110.

From the foregoing it also appears that Meseck is not a necessary party to this suit. Fitzgerald does not ask for more than his half of the money paid to McFadden; McFadden can demand nothing from Meseck or Fitzgerald which the decree will not assure him. Meseck cannot himself sue and so subject McFadden and Helms to a second suit because he has waited for four years and a half with notice of the deceit and has not moved; he was a witness on the trial and was chargeable with notice of what came out there. Finally, the contract with the Navy was not a ratification of the release because the parties had expressly provided that it should not be. There was nothing unlawful in their doing so, or any reason why they should not stipulate that the status quo should remain as between themselves. Fitzgerald's receipt of his share of the payment could not have been an "affirmation" of the release in the face of such an agreement. Thus there is no obstacle to the recovery by Fitzgerald from McFadden of $2,500 with interest from the dates of payment.

As to Fitzgerald's payments to finance the Sealand Company somewhat different considerations apply. A decree against that company would, to be sure, be part of the restitution, since it was privy to, and chargeable with, Helms's deceit. But such a decree would probably be without value, and the question is whether any decree should go against Helms and McFadden, as Helms's principal. That must depend upon whether they are liable in delicto for Fitzgerald's loss—not in restitution, but in damages. Any money advanced after Helms delivered Hutchinson's report to Fitzgerald was a consequence of that deceit; for while it does not expressly appear that Fitzgerald would not have gone on, had he known of the Freeman patent, such an inference from the whole situation is altogether safe. More than that, Helms is liable for all payments between January first, when he knew of the Freeman patent, and January 21, 1932, because during that period he allowed Fitzgerald to act upon his original statement that his search had proved negative, a statement which he then knew to be false, and on the faith of which Fitzgerald was financing the Sealand Company. Loewer v. Harris, 57 F. 368 (C.C.A.2); Monier v. Guaranty Trust Co., 82 F.(2d) 252, 254, 104 A.L.R. 912 (C.C.A.2) (semble). Gerdes v. Lustgarten, 266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309, is very similar. There is no objection to thus combining a recovery upon a legal cause of action with a cause of suit for restitution; equity will close up the whole matter at one time. However, as this part of the recovery will be for damages, theoretically it must be limited to the difference between Fitzgerald's payments to the Sealand Company and any benefit which these added to his shares. Since the McFadden patent has never issued, it is not likely that this has any practical importance; but if the parties cannot agree, it must be settled in the district court.

The reasoning by which Helms is liable for the Sealand payments also applies to make him liable for any payment made to McFadden after January 1, 1932. He then knew that Fitzgerald was relying upon his word and that it had become false; he is liable for any resulting loss. Again the measure of that loss is the difference between the payments and the value of the interest which they purchased.

Decree reversed; case remanded with instructions to proceed in accordance with the foregoing.